**Ronald FINK, et al., Appellants**

**v.**

**NATIONAL SAVINGS AND TRUST COMPANY, et al.**

No. 84–5081.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1984.

Decided Sept. 3, 1985.

As Amended Sept. 3, 1985.

Scalia, Circuit Judge, concurred in part, dissented in part, and filed an opinion.

Samuel W. Halpern, Washington, D.C., with whom James S. Ray and Orrin Baird, Washington, D.C., were on the brief, for appellants.

Alfred H. Moses, Washington, D.C., for appellees, Schoen, et al.

James E. Wesner and Jonathan Ginsburg, Washington, D.C., were on the brief, for appellee, NS & T Company.

Thomas L. Holzman, Atty., Dept. of Labor, Washington, D.C., was on the brief, for amicus curiae urging reversal.

Before MIKVA and SCALIA, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion concurring in part and dissenting in part filed by Circuit Judge SCALIA.

MIKVA, Circuit Judge:

Ronald Fink and Charles Kraft were participants in an employer sponsored retirement plan. Upon termination of their employment, they unsuccessfully sought to obtain benefits due under the plan. Fink and Kraft then brought suit in U.S. District Court to enforce their rights to benefits under the plan and to remedy breaches of fiduciary duty which led to the plan's financial difficulties. The District Court held that each of the claims for relief was time-barred, and granted summary judgment for the defendants below. In construing the statute of limitations contained in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1113 (1982), we hold that the District Court erred in granting summary judgment as to claims that arose in the six years prior to the filing of this suit in which Appellants lacked actual or constructive knowledge of fiduciary breaches. In addition, disputed issues of material fact were present as to claims of fraud or concealment. Accordingly, we reverse and remand this case to the District Court.

## I. BACKGROUND

Appellants Fink and Kraft are former employees of Consumers United Group, Inc. ("CUG"), a holding company engaged in the marketing, administration, and underwriting of group insurance programs, primarily for nonprofit associations. Appellees are CUG, its founder, James P. Gibbons, the CUG Profitsharing and Trust Plan (the "Plan") as well as the National Savings and Trust Co. ("NS & T"), a bank currently serving as the Plan's trustee, and the first trustees of the Plan, Richard D. Schoen, Denis G. Baron and Robert T. Freeman (collectively, the "initial Trustees"). NS & T was appointed to succeed the initial Trustees to avoid the necessity of registering CUG's stock under the Securities Act of 1933, 15 U.S.C. § 77a (1982). *See* 15 U.S.C. § 77c(a)(2). NS & T assumed its duties in January 1975.

The Plan was established in 1973 at the request of Gibbons. Despite its name, it

was designed to provide retirement income to CUG employees by essentially conveying a 50% ownership interest in CUG to the employees; upon retirement, employees could convert their portion of the Plan's account balance into cash. Benefits were payable in one of three ways, at the election of the Plan Administrator: in a lump sum, in yearly installments extending over a maximum of ten years, or in the form of an annuity.

At the inception of the Plan, Gibbons owned 250 shares of CUG stock, which constituted 100% of CUG's common stock. In December 1974, CUG issued 250 additional shares of stock and sold the entire new issue to the Plan. The value of these shares was determined by Alexander Brown & Sons, an investment banking firm and member of the New York Stock Exchange. The Plan received the approval of the Internal Revenue Service in September 1974.

The Plan was funded solely by contributions from CUG; no employee contributions were allowed under the Plan and none have ever been made. There was no public market for the stock, nor did it pay any dividends. Thus, the 250 shares sold by CUG to the Plan could only be paid for to the extent CUG was able to make contributions under the Plan. CUG's method of funding the Plan was somewhat convoluted due to two limits imposed under the Internal Revenue Code on employer contributions. First, consistent with the status of the Plan as one of profit sharing, contributions could only be made out of current or accumulated profits. Rev.Rul. 66–174, 1966—1 C.B. 81. Second, total contributions were limited to fifteen percent of CUG's payroll. 26 U.S.C. § 404(a)(3)(A).

The principal selling price for the 250 shares of stock was $1,711,000. Of that total, the Plan paid CUG $191,802.49 in cash in 1974. These monies had been contributed previously to the Plan by CUG. In addition, the Plan gave CUG a promissory note for the balance of $1,519,197.15 (the "Note"), payable from contributions made by CUG to the Plan over ten years.

The Note called for interest at six percent per annum on the unpaid principal. The Plan also executed a Security Agreement, granting CUG a security interest in all shares for which it had not yet been paid. The Note and Security Agreement expressly provided that in the event the Plan did not make full and timely payments on the Note, CUG's sole recourse was to repossess those shares for which payment had not been made.

Initially, half of the Plan's assets consisted of CUG stock, with the other half consisting of liquid instruments such as Treasury Notes also purchased with monies contributed by CUG. This arrangement was in conformity with the Internal Revenue Service's advance ruling requirement that not more than one-half of the assets of a profit sharing plan be placed in employer securities. When ERISA was enacted, this limitation was removed, permitting profit sharing plans like the Plan to invest 100 percent of their assets in employer securities. *See* H.R.Rep. No. 93–1280, 93d Cong., 2d Sess. 317–18, *reprinted in* [1974] U.S. Code Cong. & Ad.News 4639, 5038, 5097. Accordingly, in 1976 the Trust was amended to provide that "the Trustee may, and the Company desires the Trustee to, invest the entire Trust Fund in the capital stock of the Company." From 1977 on, over 90 percent of the Trust's assets were invested in CUG stock.

From the inception of the Plan, the value of the CUG stock steadily increased and CUG made the maximum contributions to the Plan allowed by law. However, in 1979, CUG's business took a serious downturn due to the loss of their largest customer. As a result, CUG made no contributions to the Plan in 1978 or subsequent years; the Plan, in turn, could not make payments on the Note after April 14, 1978, and was unable to make benefit payments in the manner provided for under the Plan. *See* page 954 *supra.*

When Fink and Kraft left the employ of CUG in 1979, each received statements of their accounts with the Plan. In accordance with the terms of the Plan, Fink was

promised payment of his balance of approximately $5,600 in five annual installments; Kraft was promised his balance of approximately $10,800 in ten annual installments. Both Fink and Kraft received a $1,000 payment late in 1979 and another $1,000 in 1980. No further payments were received. When the Plan's inability to make timely payments became apparent, this suit was initiated as a class action. Appellants alleged, *inter alia,* breaches of contract and of fiduciary duty under ERISA. The District Court denied class certification and held that all causes of action were time-barred.

In reviewing a district court's grant of a motion for summary judgment, a court of appeals looks at the case *de novo. Callahan v. Woods,* 736 F.2d 1269, 1272 (9th Cir.1984). We therefore do not restrict our review of the disposition of the fiduciary claims to whether the District Court abused its discretion, but instead examine the record closely and consider the same question put to the District Court: is there a genuine issue as to a material fact? *See United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). We find such issues present.

## II. BREACH OF FIDUCIARY DUTY

Appellants' principal allegation is against NS & T for violations of the fiduciary duties specified in ERISA, 29 U.S.C. § 1104(a)(1)(A) & (B). ERISA requires a trust fund fiduciary to act "solely in the interest" of a plan's participants and beneficiaries, and to discharge his duties "with the care, skill, prudence, and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character ..." 29 U.S.C. § 1104(a)(1)(B). If a trustee fails to adhere to these fiduciary standards, he may be held personally liable under ERISA for whatever losses result to a plan from his misconduct. 29 U.S.C. § 1109(a).

■ Prudence under ERISA is measured according to the objective prudent person standard developed in the common law of trusts. S.Rep. No. 93–127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4838, 4865 ("The fiduciary responsibility section, in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts.") A court's task in evaluating fiduciary compliance with this standard is to inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola,* 716 F.2d 1226, 1232 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984).

■ This fiduciary standard is applicable to all ERISA funds, including those like the Plan which derive funds to pay beneficiaries through ownership of employer stock. The Plan is an "eligible individual account plan" ("EIAP") as defined in ERISA, 29 U.S.C. § 1107(d)(3)(A). An EIAP may be comprised solely of the employer's stock without running afoul of ERISA's ten percent limitation on employer securities contained in 29 U.S.C. § 1107(a)(2). *See* 29 U.S.C. § 1108(e). *See also Donovan v. Cunningham,* 716 F.2d 1455, 1465 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). Acquisition of employer securities by an EIAP does not, in and of itself, violate any of the absolute prohibitions of ERISA, 29 U.S.C. § 1106. *See* 29 U.S.C. 1108(e); *Donovan v. Cunningham,* 716 F.2d at 1465. In addition, the requirement of ERISA, 29 U.S.C. § 1104(a)(1)(C), that a plan diversify its assets, does not apply to the holding of employer securities by EIAP's. 29 U.S.C. § 1104(a)(2). *See Eaves v. Penn,* 587 F.2d 453, 459–60 (10th Cir.1978). However, the requirement of prudence in investment decisions and the requirement that all acquisitions be solely in the interest of plan participants continue to apply. *See id.* at 459–60; *Donovan v. Cunningham,* 716 F.2d at 1467–72. The investment decisions of a profit sharing plan's fiduciary are subject to the closest scrutiny under the prudent

person rule, in spite of the "strong policy and preference in favor of investment in employer stock." *Burud v. Acme Electric*, 591 F.Supp. 238, 248 (D.Alaska 1984).

ERISA's fiduciary duties apply to bank trustees, as well as to private individual trustees. ERISA does not create classes of trustees, subjecting some to less rigorous fiduciary standards. The trustees of the Plan were free to, but did not, appoint an investment manager to manage the Plan's assets. *See* 29 U.S.C. § 1102(c)(3). Where such an appointment is made, the trustees are relieved of their obligation to invest or otherwise manage the assets of a plan. *Id.* In addition, trustees are not liable for the acts or omissions of an investment manager. *See* 29 U.S.C. § 1105(d)(1). However, even where an investment manager has been appointed, trustees' fiduciary duties are not abrogated. 29 U.S.C. § 1105(d)(2). NS & T did not make such an appointment, and thereby reserved for itself the full panoply of fiduciary duties under ERISA, as well as the duty to manage the funds' assets prudently.

According to Appellants' First Amended Complaint, NS & T breached its fiduciary duties by acquiring and retaining CUG stock, by continuing to make payments on the Note, and by failing to rescind or undo the stock transactions. The District Court held that each of these ERISA claims against NS & T were time-barred. Suits for breach of fiduciary duty must be brought within ERISA's limitations periods:

(a) No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsiblity, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this subchapter;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation. 29 U.S.C. § 1113.

In short, the basic ERISA limitation period of six years runs from the date of the breach or violation, except in case of fraud or concealment, when it runs from the date of discovery of the breach or violation. If there is no fraud or concealment, the six year period can be reduced to three years if the defendant can show that the plaintiff had either actual or constructive knowledge of the breach or violation; the three year period runs from the time the plaintiff gained such knowledge. The statute provides that constructive knowledge is obtained through reports filed with the Secretary of Labor from which the plaintiff obtained or "could reasonably be expected to have obtained knowledge of such breach or violation." These forms are annual reports required under 29 U.S.C. §§ 1023 & 1024, and are referred to, in common parlance, as "Forms 5500." Under ERISA, a Form 5500 must include, *inter alia*, a statement of assets and liabilities, a statement of changes in net assets available for plan benefits, a statement of income and expenses, and the terms and amount of any indebtedness. *See* 29 U.S.C. § 1023(b)(2) & (3).

Appellants' principal allegation references a number of events that occurred within six years of the filing of the present action, including, *inter alia*, payments on the Note made on April 7, 1977 and April 14, 1978, as well as yearly assessments of the investments of the Plan. The District Court tested these transactions against ERISA's three year statute of limitations, examining whether appellees had actual or constructive knowledge of the violations of which they complain. The District Court correct-

ly recognized the test for applying the three year limitations period: whether a report from which beneficiaries could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary. The District Court noted that the Plan filed its annual reports for 1977 and 1978 on the required Forms 5500 with the Secretary of Labor on July 30, 1978 and October 30, 1979, respectively. The District Court found that these reports disclosed the terms of the purchase of CUG stock and of the Note given in exchange therefor, and the dispositions of the principal balance and interest expense following the annual payment. The disclosure of this information, according to the District Court, was sufficient to put appellants on notice of any and all breaches of fiduciary duty, calling into effect ERISA's three year limitation period. Because all causes of actions accrued more than three years before this action was initiated, the District Court held that all were time-barred.

Both Appellants and Appellees, as well as *amicus curiae,* the U.S. Department of Labor, read the District Court's decision as imposing a duty of diligence on ERISA beneficiaries, *i.e.,* a duty to investigate facts reported in ERISA-required forms in order to discover any lurking breaches of fiduciary duty. However, the District Court did not import a duty of diligence into the ERISA limitations period. In holding that the data in the forms provided all the relevant information needed for a reasonable person to know of a breach, the District Court misconstrued the nature of Appellants' allegations.

The gravaman of Appellants' complaint is not that NS & T's continued payments on the Note constituted the breach of fiduciary duty; those acts were certainly disclosed to beneficiaries by the Forms 5500. If those payments standing alone were at the heart of this action, we would agree with the District Court that the claims are time-barred. Plaintiffs allege, however, that NS & T breached their fiduciary duty by making those payments without ever performing their statutory duties of investigating and evaluating the Plan's investments.

■ Full performance of a trustee's duty requires much more than the mere completion of the primarily ministerial task of filing required reports. Forms provide Plan beneficiaries a brief narrative of the fiduciaries' acts during the past year; beneficiaries are entitled to assume that in performing these acts, the fiduciaries thought about them. If this were not so, the lengthy list of fiduciary duties under ERISA would mean nothing more than *caveat emptor.* A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard. *See Donovan v. Cunningham,* 716 F.2d at 1467; *Donovan v. Bierwirth,* 538 F.Supp. 463, 470 (E.D.N.Y. 1981), *modified on other grounds,* 680 F.2d 263 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

Unfortunately, a failure to perform the most basic of fiduciary duties, that of independent evaluation, is not disclosed simply by the filing of the required forms. For this reason, forms filed with the Department of Labor cannot, standing alone, constitute constructive knowledge to beneficiaries or to the Department of all breaches of fiduciary duty. The disclosure of a transaction that is not inherently a statutory breach of fiduciary duty (in contrast to, *e.g.,* a loan to a party-in-interest which is explicitly prohibited under 29 U.S.C. § 1106(a)) cannot communicate the existence of an underlying breach. *See Donovan v. Tricario,* Nos. 79–914–CIV–JWK, 79–5580–JWK, slip op. at 19–20 (S.D.Fla. Apr. 17, 1984), *aff'd sub nom. Brock v. Fricario,* 768 F.2d 1351 (11th Cir.1985); *Davidson v. Cook,* 567 F.Supp. 225, 235 & n. 14 (E.D.Va.1983), *aff'd mem.,* 734 F.2d 10 (4th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 275, 83 L.Ed.2d 211 (1984). The Forms 5500 did not require information (nor was any provided), regarding the Plan's liquidity problems or NS & T's failure to evaluate the prudence of continuing to purchase CUG stock.

In addition, filing with the Secretary is not equivalent to the approval of a Plan's operations by the Secretary. The heavy burden facing the Department, which is obliged to receive some 800,000 Forms 5500 yearly, unfortunately means that thorough review of each form and the transactions described, is, if not impossible, at least unlikely. *See Central States Pension Fund v. Central Transport, Inc.,* —— U.S. ——, ——, 105 S.Ct. 2833, 2844, 86 L.Ed.2d 477 (1985). Centralized federal filing does not read the requirement of beneficiary knowledge out of the ERISA limitations period.

■ Beneficiaries may not sleep on their rights, but they must be given some opportunity to discover a breach that the Forms do not reveal. ERISA's three year limitation period does not apply here because reasonable people cannot be expected to discern from fully completed forms that the trustee has utterly failed to perform its fiduciary duties. Instead, Congress has provided a six year period in which to bring actions where the fiduciary breach is one of omission. This conclusion follows from a plain reading of the statutory language of ERISA, rather than from the syllogism that the dissenting opinion suggests. Indeed, the dissenting opinion offers its own syllogism. The dissent's major premise is that the duty to make prudent investments, as measured by outcome, was the only fiduciary duty. Its minor premise is that breach of this duty was apparent from the fiduciary's reports. The dissent concludes that the fiduciary's reports made clear any breach of fiduciary duty, so that the three-year statute of limitations applies. This syllogism founders on its major premise. Over and above its duty to make prudent investments, the fiduciary has a duty to conduct an independent investigation of the merits of a particular investment. *See supra* p. 957. The dissenting opinion appears to accept as dispositive NS & T's argument that the reports would disclose to a reasonable person the trustee's breach of the duty to make prudent investments, thus commencing the three year limitations period. This argument is not dispositive; it

leaves untouched an action based on a fiduciary omission. Appellees may not interpose the statute of limitations governing the fiduciary's duty to make objective prudent investments as a timebar when the action is based on the fiduciary's breach of the separate duty to conduct an independent evaluation of investments. Appellants' primary allegation is precisely that NS & T omitted to perform this duty as a fiduciary. Therefore the appellants must be given an opportunity to prove that NS & T's failure to perform this duty since April 6, 1977 constituted a breach of fiduciary duty.

### III. BREACH OF COFIDUCIARY

■ ERISA provides that a fiduciary may also be liable for another fiduciary's breaches. 29 U.S.C. § 1105(a). Appellants allege that Schoen and Gibbons are liable as co-fiduciaries by knowingly participating in or knowingly concealing the acts and omissions of NS & T. Schoen serves as Administrator of the Plan and is a fiduciary of the Plan. (We note that Schoen was also one of the initial Trustees of the Plan. The statute has long since run on any violations that he may have committed while in that role.) Whether Gibbons may be said to have acted as a fiduciary is a disputed issue. Additionally, a district court may award relief against nonfiduciaries who knowingly participate in a breach of trust. *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wis.1979).

■ Schoen and Gibbons may therefore be liable for all breaches of fiduciary duty for which NS & T is liable. For those claims against NS & T which are not time-barred, allegations that Schoen and Gibbons may also be liable as cofiduciaries are similarly not time-barred. We therefore remand to the District Court the question of liability of Schoen and Gibbons as cofiduciaries.

### IV. CLAIMS THAT ARE TIME–BARRED

■ Appellants have alleged the following ERISA violations in which fraud or

concealment are not at issue and which do fall outside the three year period discussed above: first, that the initial acquisition of the stock and creation of the Note constituted a breach of fiduciary duties; second, that the failure of NS & T to sue the initial Trustees for breach of common law fiduciary duty in their acquisition of the stock constituted a breach of the duty under ERISA to remedy past breaches; third, that the payments from NS & T to CUG, including Schoen's actions, constituted a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A) & (D); and fourth, that the loan from CUG to the Plan similarly constituted a prohibited transaction. As the District Court found, each of these transactions had been disclosed on ERISA-required reports by October 30, 1979. The Forms 5500 sufficiently disclosed these transactions to bring into play ERISA's three year limitations period. Because the last report disclosing these transactions was dated more than three years before the inception of this suit, we affirm the District Court's grant of summary judgment as to those allegations. In addition, the Plan's initial acquisition of the CUG stock occurred well over six years before filing of the instant suit. Accordingly, we affirm the District Court's holding that the initial acquisition of the stock is now beyond the reach of ERISA remedies.

## V. FRAUD OR CONCEALMENT

Appellants also allege that appellees engaged in fraud or concealment. Where such acts are committed, ERISA provides six years from the date of discovery of the fraud or concealment in which to file suit. The District Court rejected Appellants' allegations of fraud and concealment, finding both a failure to plead fraud with particularity as required under Rule 9, Fed.R. Civ.P., and insufficient facts to create a genuine dispute as to the existence of fraud or concealment.

■ While the Comptroller's Report referred to by the District Court raises a significant specter of fraud, we are constrained in our review by appellant's fail-ure to plead fraud. The first allegation of fraud appears in Plaintiff's Opposition to Defendant's Motion for Summary Judgment. Rule 9 of the Fed.R.Civ.P. requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9 is to be read in tandem with the Rule 8, Fed.R.Civ.P., requirement of simplicity in drafting and flexibility in reviewing pleadings. *See* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 406 (1969). However, some allegation of fraud must be made at the pleading stage. Because none was made, there was no basis for the District Court's findings. We therefore vacate the District Court's grant of summary judgment on this issue. On remand, appellants may seek leave of the District Court, pursuant to Rule 15, Fed.R. Civ.P., to amend their complaint to include a sufficiently particularized allegation of fraud; "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15.

## VI. BREACH OF CONTRACT

■ Appellants have also alleged breach of contract against CUG for its failure to continue the Plan on a sound financial basis that would have permitted full and timely payments to beneficiaries. The District Court granted summary judgment on this count; we affirm.

The Plan was set up as a Profit Sharing Plan. Employer contributions to a profit sharing plan are by definition contingent on profits. The documents surrounding the Plan reiterate that CUG was obliged to make contributions only insofar as their financial position permitted, and that obligation did not confer responsibility on CUG for the payment of benefits. The Plan Agreement provides that:

Members of the Plan and Former Members shall look only to the Trust Fund established under the Plan for the satisfaction of the benefits payable under the Plan, and the Employer shall have no obligation to make or continue to make contributions under the Plan or to pay

directly any benefits contemplated by the Plan.

Plan Agreement, Art. 14, Sec. 3. Additionally, the Plan Agreement explicitly addressed the possibility that CUG might be unable to make contributions:

> Section 1. *Discontinuance of Employer Contributions.* The Employer has established the Plan with the bona fide intention that from year to year it will be able to and will deem it advisable to make contributions under the Plan. Circumstances not now foreseen or circumstances beyond the control of the Employer may make it either impossible or inadvisable for Employer to continue to make contributions under the Plan or may make it necessary to terminate the Plan. If the C.U.G. Board of Directors may decide it is impossible or inadvisable for the Employer to continue to make contributions under the Plan[,] the C.U.G. Board of Directors may by resolution discontinue further Employer contributions under the Plan.

Plan Agreement, Art. 7, Sec. 1.

Appellants essentially argue that other communications, both written and oral, support the notion of an implied contract between CUG and the beneficiaries whereby CUG was obligated to make payments. We note that CUG was prohibited from making any contributions to the Plan except out of profits or earned surplus. *See* Rev.Rul. 66–174, 1966–1 C.B. 81. The writings proffered by Appellants do not support their argument. We therefore affirm the District Court's grant of summary judgment. While CUG may have operated as a fiduciary and incurred liability in that capacity, appellants cannot be heard to say that CUG failed to perform a contractual duty where there was none to perform.

## VII. DENIAL OF CLASS CERTIFICATION

Appellants also raise the District Court's denial of class certification. In refusing to certify the class, the District Court neither conducted a hearing, nor made findings. The District Court's order denying class certification states only that appellants failed to meet the requirements of Fed.R. Civ.P. 23(a)(3) ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"), and of Fed.R.Civ.P. 23(a)(4) ("the representative parties will fairly and adequately protect the interests of the class").

A District Court is accorded broad discretion in determining whether a suit should proceed as a class action. Our review is confined to inquiring whether the District Court abused that grant of discretion. *Bermudez v. United States Department of Agriculture,* 490 F.2d 718, 725 (D.C.Cir.), *cert. denied,* 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973). While there is no explicit requirement in this Circuit that a District Court grant a hearing or provide findings on the class issue, our reviewing task here, however limited, is rendered impossible in their absence. *See In re Franklin Nat'l Bank Securities Litigation,* 599 F.2d 1109, 1111 (2d Cir.1978). There were numerous factual disputes before the District Court regarding the "typicality" of Appellants' claims and defenses and their adequacy as class representatives. The brief Order here provides no indication that the District Court even considered the possibility of subclasses or of certifying a narrower class, to avoid a potential conflict between the interests of current employees and those of past employees of CUG. Nor is there evidence that the District Court considered appointing a class representative other than Fink or Kraft.

Contrary to the position that the dissenting opinion adopts, the reviewing court may require the district court to consider on the record the possibility of certifying subclasses. The dissent cites *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 408, 100 S.Ct. 1202, 1214, 63 L.Ed.2d 479 (1980) for the proposition that the district court has no *sua sponte* obligation to construct subclasses. This observation, however, must be read in its proper context. In *Geraghty,* the Court of Appeals for the Third Circuit had remanded

the case to the district court to evaluate the possibility of subdividing the proposed class. The Supreme Court approved this remand, finding that it did not impose undue burdens on the district court. The Court simply directed that once the subclass question is before the district court, the party seeking subclasses and not the court has the burden of constructing and proposing them. While the court need not take the initiative, *Geraghty* holds, it must weigh the possibilities of subclasses or of certifying a narrower class. *Id.* at 407–08, 100 S.Ct. at 1214.

In light of our remand on the bulk of the claims raised below, and the factors that favor conducting litigation affecting a group as a class action, we find the class issue appropriate for fuller consideration. On remand, then, the District Court should consider to what extent the fashioning of subclasses would cure any alleged defects of the class and whether, if certification is otherwise appropriate, there may be a person who could fulfill the requirements of class representative.

### VIII. Conclusion

We reverse the District Court's grant of summary judgment on the claims described herein in which Appellants lacked knowledge, actual or constructive, of breaches of fiduciary duty that occurred within six years of the filing of this suit. These claims may be pursued against both NS & T and its cofiduciaries. In addition, we vacate the grant of summary judgment as to the claims in which fraud or concealment were involved; appellants' failure to plead fraud may be rectified on remand through the filing of particularized pleadings. We remand to the District Court these claims, as well as the class certification issue, for fuller resolution.

*It is so ordered.*

SCALIA, Circuit Judge, concurring in part and dissenting in part:

In my view, the judgment of the District Court should be affirmed in all respects, except for its dismissal of the claim for breach of fiduciary duty to investigate and evaluate investments, and for breach of fiduciary duty to invest prudently subsequent to April 6, 1980.

### I

Absent fraud or concealment, a suit alleging a breach or violation of the duties imposed by Title I of the Employee Retirement Income Security Act of 1974, Pub.L. No. 93–406, 88 Stat. 829, codified as amended at 29 U.S.C. §§ 1001–1144 (1982) ("ERISA"), must be commenced within three years of the earliest date "on which a report from which ... [the plaintiff] could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary [of Labor]," 29 U.S.C. § 1113(a)(2)(B). The District Court held that this provision barred appellants' claims that appellee, National Savings and Trust Company ("NS&T"), had breached various fiduciary duties under 29 U.S.C. § 1104(a)(1)(B) with respect to assets of the Profit Sharing Plan and Trust ("Plan") of which it was trustee, because reports filed with the Secretary of Labor more than three years before the commencement of appellants' suit had disclosed "all of the material facts relevant to the transactions of which plaintiffs complain." *Fink v. National Savings & Trust Co.*, Civil No. 83–992, slip op. at 4 (D.D.C. Nov. 22, 1983) ("Mem. op.").

The majority's reasoning in reversing this determination with regard to NS&T's role in the Plan's continuing investment in the stock of Consumers United Group, Inc. ("CUG") (and the Plan's related payments on a note payable to CUG) appears to be captured by the following syllogism: (1) NS&T's failure to investigate and evaluate the investments made by the Plan would constitute a breach of fiduciary duty sufficient to render the continuing investment in CUG stock and payments on the accompanying note actionable; (2) that failure was not disclosed in reports filed with the Secretary; therefore (3) a breach of fiduciary duty sufficient to render the investment and payments actionable was not

disclosed in reports filed with the Secretary—with the consequence that the three-year statute of limitations does not apply. The flaw in the syllogism is its major premise: Breach of the fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee, *see, e.g., Donovan v. Bierwirth,* 538 F.Supp. 463, 471 (E.D.N.Y.1981), or perhaps even to recover trustee fees paid for the investigative and evaluative services that went unperformed. But it does not sustain an action for the damages arising from losing investments. I know of no case in which a trustee who has happened—through prayer, astrology or just blind luck—to make (or hold) objectively prudent investments (*e.g.,* an investment in a highly regarded "blue chip" stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand. Similarly, I know of no case in which a trustee who has made (or held) patently unsound investments has been excused from liability because his objectively imprudent action was preceded by careful investigation and evaluation. In short, there are two related but distinct duties imposed upon a trustee: to investigate and evaluate investments, and to invest prudently. Neither does the faithful discharge of the first satisfy the second, nor does breach of the first constitute breach of the second. To be sure, the extent of the trustee's investigation and evaluation is often the focus of inquiry in imprudent-investment suits. *See, e.g., Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). But that is because the determination of whether an investment was objectively imprudent is made on the basis of what the trustee knew *or should have known;* and the latter necessarily involves consideration of what facts would have come to his attention if he had fully complied with his duty to investigate and evaluate. It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit; breach of the latter duty is merely evidence bearing upon breach of the former, tending to show that the trustee *should have known* more than he knew.

What the appellees argued in the present case was, essentially, that in order for the appellants to perceive that they had a claim for imprudent investment in connection with the CUG stock and note, it was unnecessary for them to be aware that the trustee should have known more than he did—*i.e.,* that the trustee had not been investigating and evaluating this investment, a fact undisclosed in the filed reports; that if, as appellants contend, the investment of ERISA funds in the stock of the employing company is measured against the same standard of prudent investment applicable to other investments by a fiduciary, then the breach of duty to make prudent investments was apparent on the basis of what the trustee concededly *knew,* as set forth in the reports, with no need to probe further. That seems to me correct. In 1978, a year in which the Plan lost over $100,000, NS&T continued to invest nearly all of the Plan's assets in the nonmarketable stock of a company that did the bulk of its business with one customer under a contract that was soon to expire, and continued to pay interest on the accompanying note. Each of these facts was known to NS&T, and each of them was recited in the filed reports. The breach of fiduciary duty to make prudent investments was, it seems to me, plain on the face of the reports. In insisting that the nondisclosure of failure to investigate and evaluate caused nondisclosure of that breach, the majority is either (1) confusing the claim for imprudent investment with the entirely separate claim for failure to investigate and evaluate, or (2) confusing the claim for imprudent investment with *evidence* of the claim for imprudent investment, so that unless and until all the evidence is disclosed—no matter how clear and conclusive the previously disclosed evidence may be—the three-year statute does not run.

Appellants rightly note, however, that the three-year statute of limitations cannot bar their claim for NS&T's alleged failure to invest prudently during the period with-

in three years of commencement of this suit, *i.e.*, from April 6, 1980. The damages recoverable, of course, would be only those attributable to action NS&T took or failed to take during that period. *See Buccino v. Continental Assurance Co.*, 578 F.Supp. 1518, 1520–23 (S.D.N.Y.1983).*

While agreeing, therefore, that the Complaint in the present case was not properly dismissed insofar as it sought relief for the trustee's breach of its duty to investigate and evaluate investments, or for the trustee's imprudent investment after April 6, 1980, I dissent from the majority's holding that recovery of damages for imprudent investment in CUG stock and for the accompanying note payments prior to April 6, 1980 is not time-barred.

## II

The District Court also rejected appellants' argument that the six-year limitations period governing cases of fraud or concealment, 29 U.S.C. § 1113, should be applied to certain of appellants' claims. After noting in passing that appellants had failed to plead fraud with particularity as required by FED.R.CIV.P. 9(b), the District Court held that appellants had failed to raise a genuine issue of material fact regarding fraud or concealment. Mem. op. at 7. The majority vacates the District Court's grant of summary judgment on this issue, advises appellants to seek leave to amend their Complaint, and stresses that leave to amend should be given freely when justice so requires. Maj. op. at 959. This disposition is unsupported by authority or argument, and seems to me inconsistent with the purpose of Rule 9(b).

It is unfathomable why the plaintiffs' failure to comply with the Rule 9(b) pleading requirement should *cure* (rather than aggravate) the plaintiffs' further fatal failure to set forth—either in their Complaint or in affidavits, depositions, answers to interrogatories or admissions permitted to be considered under Rule 56(c)—facts sufficient to preclude dismissal of the fraud and concealment claim. The majority in effect rewards the plaintiffs for disregarding Rule 9(b), by giving them another chance (which plaintiffs who had pleaded properly would not have) to present facts sufficient to withstand summary judgment. This would only make sense if Rule 9(b) were a sort of paternalistic provision intended for plaintiffs' own benefit—to assure that they allege in their Complaint some facts that (at least if uncontroverted, *see* FED.R.CIV. P. 56(e)) will defeat a motion for summary judgment. Heaping solicitude upon paternalism, an appellate court might reason that since the plaintiffs (through their own fault, but never mind that) did not have the benefit of this protection, they should be given another run at the summary judgment motion. But of course Rule 9(b) is not intended for plaintiffs' benefit at all, but rather to "give defendants fair notice of the plaintiffs' claims and grounds therefore [*sic*], so that they can frame their answers and defenses." *Kaufman v. Magid*, 539 F.Supp. 1088, 1093 (D.Mass.1982) (citations omitted).

The majority's error on this point is compounded by the fact that sound practice, which adopts that interpretation of ambiguous events which supports rather than impeaches the District Court's judgment, would regard the District Court as already having allowed the plaintiffs' motion to

---

* Appellants also argue that their claim for NS& T's failure to distribute benefits according to the Plan, in violation of 29 U.S.C. § 1104(a)(1)(D), could not be time-barred, even by the three-year statute of limitations, because it did not accrue until October 1981, when the failure to distribute allegedly began. Explicit assertion that the failure to distribute benefits constituted a breach of § 1104(a)(1)(D) appeared for the first time, however, in appellants' motion for reconsideration of summary judgment. Even if the Complaint's generalized references to failure to act in accordance with Plan documents (other of which failures were specified) were adequate to present this claim (which is doubtful), the failure to raise the issue of the impropriety of applying the statute of limitations to it until after summary judgment precludes consideration of the issue on appeal. "[A]n argument first raised in a postjudgment motion is simply too late." *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1030 (5th Cir.1982) (citation and internal quotation omitted).

amend. Because there was no suggestion here that defendants were prejudiced by the plaintiffs' failure to plead fraud with particularity, the District Court could properly have treated the plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment—in which allegations of fraud or concealment were first advanced with some factual detail—as a motion to amend the pleadings. *See Buccino v. Continental Assurance Co.,* 578 F.Supp. 1518, 1524 n. 5 (S.D.N.Y.1983); 6 MOORE'S FEDERAL PRACTICE ¶ 56.10 (2d ed. 1985).

But as I have suggested above, all discussion of the pleading failure is really beside the point. The District Court dismissed the fraud or concealment claim not because appellants had failed to comply with Rule 9(b), but because they had failed to raise a genuine issue of fact—and, I might add, had not only failed to do it in their pleadings, or in any depositions, answers to interrogatories, admissions and affidavits that Rule 56(c) allows to be considered, but had even failed to do it in either their Memorandum in Opposition to Defendants' Motion for Summary Judgment or their Motion Pursuant to Rule 59(e), F.R.C.P., to Reconsider and Vacate Summary Judgment and to Deny Defendant's Motion for Summary Judgment. The dismissal for that reason was correct, and all discussion of the pleading failure is irrelevancy.

The majority does not reach the question whether the District Court was correct in its assessment that plaintiffs had failed to raise an issue of material fact regarding fraud or concealment, although it hints that "a significant specter of fraud" was raised by the "Comptroller's Reports referred to by the District Court." Maj. op. at 959. The Comptroller's Reports indicate only that NS&T was criticized by the Comptroller for its failure to investigate and evaluate the prudence of the plan's investment. Such inaction, if proven, would likely constitute a breach of fiduciary duty, but not fraud or concealment. "It does not follow from the fact that ... [defendants] committed a breach of fiduci-

ary duty that they were also guilty of fraud." *Renz v. Beeman,* 589 F.2d 735, 749 (2d Cir.1978), *cert. denied,* 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). I would affirm the District Court's judgment that the appellants failed to raise a genuine issue of material fact as to the existence of fraud or concealment.

### III

The District Court denied appellants' motion for class certification, holding that appellants failed to meet the requirements of FED.R.CIV.P. 23(a)(3) ("typicality") and 23(a)(4) ("adequacy"). *Fink v. National Savings & Trust Co.,* Civil No. 83–992 (D.D.C. Sept. 20, 1983) (Order denying class certification). The majority acknowledges that the District Court has broad discretion in determining whether a suit should proceed as a class action, and that there is no requirement in this Circuit that trial judges hold hearings or issue findings with respect to class certification determinations. The majority holds, however, that it is incapable of deciding whether the District Court abused its discretion in this case, citing the existence of "numerous factual disputes" and the absence of "evidence" that the District Court considered seeking out other possible class representatives, creating subclasses, or certifying a narrower class. Maj. op. at 960–961. Unlike the majority, I find myself capable of performing my "reviewing task," *id.* at 960, and I cannot find that the District Court's judgment was an abuse of discretion on the undisputed facts of this case. *Cf. Postow v. OBA Federal Savings & Loan Association,* 627 F.2d 1370, 1380–81 n. 24 (D.C.Cir.1980) (district court certified class without holding hearings, making nonconclusory findings, or giving any explanation of its implicit holding that common issues predominated over individual issues; no abuse of discretion on the facts of the case).

It is certainly true that there were factual disputes regarding some issues connected with class certification. But it was *un* disputed that, unlike other class members,

Fink had participated in the formulation of the Plan, and Kraft very likely had done so—so that both appellants might be subject to defenses of estoppel inapplicable to other class members; that appellants, whose benefits under the Plan were determined in 1978, might have significantly different interests from other Plan participants who left the Plan earlier or later; that appellants, unlike other class members, were not currently employees and beneficial owners of the company whose stock was owned by the Plan; and that Fink had sought to obtain preferential payment of his Plan benefits. *Compare* Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification 10–19 (setting forth the aforementioned facts) *with* Memorandum of Plaintiffs Fink and Kraft in Reply to Defendants' Opposition to Motion for Class Certification (disputing the legal implication of, but not denying, the aforementioned facts). These undisputed facts are more than enough to prevent our finding the District Court's refusal to certify the requested class an abuse of discretion. *See, e.g., Phillips v. Klassen,* 502 F.2d 362, 366–67 (D.C.Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974) (affirming district court's denial of class certification because there was some likelihood of conflicts among class representatives).

The majority opinion also faults the District Court, however, for "provid[ing] no indication that [it] even considered the possibility of subclasses or of certifying a narrower class, to avoid a potential conflict between the interests of current employees and those of past employees." Maj. op. at 960. The Supreme Court has made clear, however, that

> [I]t is not the District Court that is to bear the burden of constructing subclasses. That burden is upon the respondent and it is he who is required to submit proposals to the court. The court has no *sua sponte* obligation so to act.

*United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 408, 100 S.Ct. 1202, 1214, 63 L.Ed.2d 479 (1980). Though the appellants had ample time to make propos-

als between the denial of their motion for class certification on September 20, 1983 and the entry of summary judgment on November 22, their only proposal (made in their September 2 Memorandum in Reply to Defendants' Opposition to Motion for Class Certification) was a class of all former CUG employees. The rejection of this alternative could in no way be an abuse of discretion, given the fact that the named plaintiffs' employment by CUG at the time of creation of the Plan and participation in its creation raised estoppel questions. This would make them atypical and thus inappropriate representatives even for the proposed narrower class of all former employees.

Finally, the majority notes the lack of "evidence that the District Court considered appointing a class representative other than Fink or Kraft." Maj. op. at 960. I know of no authority for the proposition that the District Court has an obligation to seek out alternative class representatives. *See, e.g., Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, 812 (5th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982) (district court has no duty to recruit new plaintiffs).

In sum, while the majority's opinion on this aspect of the case expressly acknowledges both the trial judge's "broad discretion" and the lack of necessity for specific findings, its holding seems compatible with neither principle. It represents in my view a deep encroachment upon the domain of the District Court.

Except as set forth above, I concur in the majority's disposition.